CLERK'S OFFICE U.S. DIST COURT
AT ROANOKE, VA
FILED

AUG 0 9 2005

JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| CHECK 'n GO OF VIRGINIA, INC., ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 6:04-CV-00050 |
| ) | |
| THOMAS LASERRE, JR., et al., ) | By: Michael F. Urbanski |
| Defendants. ) | United States Magistrate Judge |

## MEMORANDUM OPINION

Plaintiff Check 'n Go of Virginia, Inc. ("CnG-V") filed a three-count complaint in state court alleging that defendants B & L Management, Inc. d/b/a American Cash Center, Inc. ("ACC"), and Thomas Laserre, Jr., tortiously interfered with CnG-V's contract with one of its former employees, Nannette Saunders, and that she, acting on behalf of ACC, misappropriated certain CnG-V Policy and Procedure manuals which CnG-V contends are its protected trade secrets. Defendants subsequently removed this action to federal court.

Plaintiff CnG-V and defendant ACC are competitors in the relatively new payday loan industry.[1] CnG-V is a wholly-owned subsidiary of Check 'n Go Financial (CnG-Fin.), an Ohio-based holding company. Though its subsidiaries, CnG-Fin. operates the second largest payday loan business in the United States, with more than 1,000 payday loan outlets in 30 states. See Revised Stipulation 19. CnG-Fin. began business in 1994. ACC is both a smaller and more recent entrant into the market, opening its first retail location in South Carolina in 2002. In that year, Virginia law authorized the operation of payday loan companies, and ACC opened its

---

[1]The payday loan business operates by providing short term loans to consumers needing cash between their paychecks. A consumer in need of ready cash writes a check in the amount of the loan, plus a surcharge, to the payday loan company and obtains the loan proceeds. After a short period, ostensibly after the consumer has been paid, the principal is retained and the payday company keeps the surcharge.

Lynchburg store in September, 2002. A bench trial was held on July 20, 2005, at the conclusion of which the court found that the evidence established that plaintiff CnG-V had proven that Saunders, acting for ACC, misappropriated CnG-V's trade secrets in violation of the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-336 et seq. The court found that the evidence was insufficient, however, to prove the tortious interference claim as there was no evidence that defendant had knowledge of any agreement between plaintiff CnG-V and Saunders.

As to the trade secrets claim, the evidence established that CnG-Fin. had developed certain detailed Policy and Procedure manuals, Exhibits 4 and 5,[2] utilizing the collective experience and knowledge of its management staff, and at considerable expense with the assistance of the national consulting firm of Deloitte and Touche.[3] As such, based largely on the credible testimony of William Foltyn, a 409 Group Vice President, CnG-V proved that the information derived independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can gain economic value from its disclosure or use. Also, the evidence established that the materials were the subject of reasonable efforts to maintain its secrecy as each employee, including Saunders, was required to sign a CnG-V confidentiality agreement. Further, the distribution of the manuals was limited as

---

[2]Exhibit 4 is entitled "Store Account Management Policies and Procedures Manual," and contains the core of the step-by-step procedures claimed by CnG-V to be its trade secrets. Exhibit 5 is a Store Operating Procedures manual and concerns a wide variety of topics from training to emergency store procedures. Exhibit 8, consisting of 18 pages of Saunders' pirated CnG information, largely duplicates portions of Exhibit 4. See Exhibit 16, which compares Exhibits 4 and 8.

[3]These Policy and Procedure manuals were developed with the assistance of 409 Group, Inc., a management firm that supports the operations of the various CnG affiliates. Deloitte invoiced CnG-Fin. for its services in developing the Policy and Procedure manuals. Neither CnG-Fin. nor 409 Group were named as parties plaintiff in this case.

2

there was only one copy per store, and it was kept behind the counter and out of the public domain. See Revised Stipulation 11. The existence, value and secrecy of the trade secret were clearly established by Foltyn's testimony.

Saunders testified that Laserre solicited her to come to work as a manager for ACC, and that she came to work for ACC in April, 2003 as the manager of its new Forest, Virginia location. Before she left CnG-V, Saunders testified that she copied substantial portions of the CnG Policy and Procedure manuals, and that Laserre had told her to "bring what you got." Saunders testified that she used these CnG manuals to develop a procedure manual for her new employer, ACC, which had no such written policies. Saunders testified that the draft manual she created spanned more than 100 pages, most of which came from the photocopied CnG materials. Saunders said that she worked on the new ACC manual at her desk at the ACC Forest store, and that on the three to four occasions that Laserre visited her while she was working on the manual, she told Laserre that the photocopied source material came from CnG. Saunders testified that she showed Laserre her draft manual and later gave him a copy. Saunders also gave a portion of her draft manual, amounting to 18 pages, to the manager of the ACC Lynchburg and Altavista stores, and testified that these stores used those materials. Saunders also testified that she used this material herself in the Forest store and faxed the 18 pages to ACC's Chesapeake store. The evidence established that large portions of these 18 pages were substantially the same as that contained in Exhibit 4, the CnG Account Management manual. See Exhibit 16.

For some inexplicable reason, Eleanor Anderson, then manager of ACC's Lynchburg store manager, faxed Saunders' 18-page document to CnG-V. See Revised Stipulation 14. In turn, CnG-V's counsel advised ACC of its non-compete with Saunders by letter dated July 16,

3

2003. See Exhibit 6. Saunders was placed on administrative leave by ACC, and ultimately terminated by ACC after CnG-V wrote to complain that she had pirated its trade secrets. Revised Stipulation 12; Exhibit 10. As a result, Saunders' tenure with ACC was very brief, and she was actively employed from only April to August 26, 2003. Revised Stipulations 6, 7.

While substantial portions of Saunders' testimony were suspect and directly controverted by Laserre, there is no dispute that Saunders created the 18-page document from CnG-V's protected information and used it in the service of ACC. The 18-page document was introduced as Exhibit 8. As such, CnG-V proved that ACC, acting through Saunders, misappropriated the trade secrets reflected in these 18 pages. See Microstrategy, Inc. v. Business Objections, S.A., 331 F. Supp. 2d 396, 418 (E.D. Va. 2004).

Both Saunders and Laserre testified that Saunders did not tell Laserre that she had signed a confidentiality agreement or a non-compete with CnG-V. See also Revised Stipulation 18. Laserre generally disputed Saunders' testimony, and stated that he did not know that Saunders had taken any information from CnG-V, and that Saunders did not give him a draft policy manual. Laserre said he did not see the 18-page document, Exhibit 8, until after suit had been filed and was not aware that it had ever been used by ACC. Laserre testified that he did not think any of the information in the 18-page document was a trade secret as it merely reflected common practices used in an industry regulated closely by the Commonwealth of Virginia in the Payday Loan Act, Va. Code § 6.1-444, and regulations promulgated thereunder by the State Corporation Commission.

Despite proving the existence of a trade secret and its misappropriation, CnG-V readily admitted that it had no proof of any actual damages sustained by it or of unjust enrichment to

4

ACC. CnG-V made no claim for injunctive relief under Va. Code § 59.1-337 or attorney's fees for willful and malicious misappropriation under Va. Code § 59.1-338.1. The exclusive remedy sought by CnG-V was the award of a reasonable royalty under Va. Code §59.1-338. CnG-V offered evidence of the total cost to develop its Policy and Procedure manuals, but had no direct evidence as to the cost to create those portions of the manuals reflected in the 18 pages. On this score, the court in open court stated that CnG-V's evidence as to a royalty appeared too speculative to support an award of damages.

The court did not enter final judgment at trial, noting that it wanted to consider further two legal issues. The first issue concerned the extent to which CnG-V's trade secret claim was undermined by Virginia's regulatory framework. The second question was whether plaintiff's proof was sufficient to establish a reasonable royalty under Va. Code § 59.1-338.

Having reviewed Virginia's regulatory requirements for cash advance centers such as plaintiff and defendant operate, the court remains convinced that the material misappropriated from CnG Policy and Procedure manuals constitute a protectable trade secret.

Likewise, after reviewing case law relevant to the issue of damages, and considering the evidence and the post-trial briefs, the court remains steadfast in its conclusion that CnG-V is not entitled to recover any damages, albeit for a different reason than as stated in court. CnG-V proved that its parent holding company, CnG-Fin., actually incurred the development costs for the manuals. There was no evidence that the named plaintiff in this case, CnG-V, spent a penny on development costs. As such, there is no basis from the evidence in this case upon which to compute any royalty due CnG-V. As such, CnG-V's claim must be dismissed and judgment entered for defendants as plaintiff presented no evidence to support a credible damages claim.

5

I.  **Review of the Regulatory Scheme Set Forth in Virginia's Payday Loan Act and Enabling Regulations Does Not Alter the Conclusion that the 18 Pages of CnG's Manuals Taken and Used by Saunders Constitute a Protectable Trade Secret.**

Having reviewed the Virginia statute and regulations governing payday loan businesses, the court finds that the regulations do not preclude a finding that the materials found in the CnG Policy and Procedure manuals constitute a trade secret.

The Payday Loan Act ("Act"), Va. Code §§ 6.1-444 et seq. discusses the licensing, operation, and regulation of payday lenders in relatively general terms. See Va. Code §§ 6.1-448 (providing that applications for licenses must be accompanied by a bond filed with the Commissioner showing corporate surety); Va. Code §§ 6.1-453 (discussing record retention requirements); Va. Code §§ 6.1-454 (stating that licensees must file an annual report on or before March 25 of every calendar year). Certainly, the Act provides general parameters as to the operation of a payday loan business. See Va. Code §§ 6.1-459 (stating, inter alia, that payday lenders are prohibited from accepting more than one check from a borrower on a given loan at a particular time, from affiliates of the payday lender from charging fees for check cashing services, and from refinancing or renewing loans).

While Virginia's regulations provide a framework within which payday lenders must operate, the legal requirements are vastly different from the detailed "how to" steps set forth in the CnG Policy and Procedure manuals. The regulations, found in Title 10 of the Virginia Administrative Code, provide general guidelines for operating payday loan centers, but are nowhere near as specific as the materials misappropriated from plaintiff, which provide a step by step recipe for operation of such a business. For instance, the regulations require a notice be

6

given to prospective borrowers indicating that payday loan businesses are not intended to cover long-term financial needs and provide the information to be included in the loan pamphlet payday loan stores are required to give their customers. They do not, however, provide details on how payday loan operations are to collect or verify information given to them by prospective borrowers, or to determine how such information is to be used to ascertain a particular borrower's creditworthiness. Thus, review of Virginia's statutory and regulatory scheme requires no alteration to the court's conclusion at trial that the materials at issue constitute a protectable trade secret.

## II. While CnG-V's Now Articulates a Basis to Compute a Reasonable Royalty, There Is No Evidence That It Is Entitled to Such An Award.

As regards damages, CnG-V introduced at trial invoices from Deloitte & Touche for services rendered to CnG-Fin. in developing the CnG Policy and Procedure manuals. CnG-V also provided a schedule listing salaries paid to persons for maintaining and improving the manuals for the period of time between their creation and alleged misappropriation. Again, however, none of those persons were employed by CnG-V. 409 Group's Foltyn testified that approximately 60% of the funds paid to Deloitte by CnG-Fin. were for Exhibit 4, the manual from which most of the material misappropriated was taken, but that some of the funds paid to Deloitte also went for unrelated projects such as corporate training and the structure of bonuses to be paid to CnG managers.

In its post-trial brief, CnG-V seeks to justify its reasonable royalty calculation by means of a series of cascading estimates, as follows. CnG-V starts by asserting that the cost to develop and maintain both of its Policy and Procedure manuals, Exhibits 4 and 5, was $134,725.

7

(Defendant's Post-Trial Memo. at 5) 409 Group's Foltyn estimated that 60% of that cost was attributable to Exhibit 4, from which Saunders took the information to create her 18 pages for ACC. CnG-V asserts further that these 18 pages contain information found on 41% of the pages of Exhibit 4. (Defendant's Post-Trial Memo. at 5) Applying these two percentages to the total cost, CnG-V comes up with an estimated reasonable royalty of $33,142.

ACC counters this calculation in its brief, noting that this estimate is overstated because certain of the information reflected on the 18 pages contains information that is derived from the Fair Debt Collection Practices Act and is thus publicly available, and there is no evidence of any revisions to the pages misappropriated from Exhibit 4 justifying the additional cost for maintenance.[4] Crediting ACC's argument to exclude 4 of the pages reduces the percentage estimated by CnG-V from 41% to 34%. Applying this percentage and eliminating the maintenance costs yields an alternative damage figure of $11,554. This figure more reasonably reflects an appropriate royalty in this case.

The Virginia Uniform Trade Secrets Act, Va. Code § 59.1-338, provides for recovery of damages for misappropriation. Indeed, the Act provides "[e]xcept where the user of a misappropriated trade secret has made a material and prejudicial change in his position prior to having knowledge or reason to know of the misappropriation and the court determines that a monetary recovery would be inequitable, a complainant is entitled to recover damages for misappropriation." Va. Code § 59.1-338. The Act includes actual loss and unjust enrichment as appropriate measures of damages, and provides that "[i]f a complainant is unable to prove a

---

[4] All of the pages of Exhibit 16 bear an issue date of October 25, 1999, suggesting that there were no revisions to this manual since that time. If that is the case, there can be no credible claim for maintenance costs associated with nonexistent revisions.

8

greater amount of damages by other methods of measurement, the damages caused by misappropriation can be measured exclusively by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret." Va. Code § 59.1-338. See also American Sales Corp. v. Adventure Travel, Inc., 862 F. Supp. 1476, 1479-80 (E.D. Va. 1994). Plaintiff contends "reasonable royalty for the use of the misappropriated information" is appropriate here because, as in many cases, defendant's use of the trade secret to its advantage had no quantifiable impact on plaintiff's business. See Univ. Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 536-37 (5th Cir. 1974). The process of arriving at a "reasonable royalty" is by nature an approximation because plaintiff did not offer its manuals for sale. See Am. Sales Corp. v. Adventure Travel, Inc., 862 F. Supp. at 1480.

University Computing is a leading case on calculating a reasonable royalty in a trade secret case. In that case, the court stated that the "'reasonable royalty' measure of damages means more than simply a percentage of actual profits. Rather, reasonable royalty should be a measure, very simply, of 'the actual value of what has been appropriated.'" Id. at 537 (quoting Vitro Corp. v. Hall Chem. Co., 292 F.2d 678, 683 (6th Cir. 1961)). The court noted that when actual value is not subject to precise measurement, "a reasonable estimate of value is used." Id. This value is based upon "the advantages which would have accrued to (the infringer) had it negotiated a license . . ." Id. The court held that in calculating this value,

> the trier of fact should consider such factors as the resulting and foreseeable changes in the parties' competitive posture; the prices past purchasers or licensees may have paid; the total value of the secret to plaintiff, including the plaintiff's development costs and the importance of the secret to plaintiff's business; the nature and extent of the use the defendant intended for the secret; and finally whatever other unique factors in the particular case which might

9

>have affected the parties' agreement, such as the ready availability
>of alternative processes.

Id. at 539 (discussing Hughes Tool Co. v. G.W. Murphy Indus., 491 F.2d 923, 931 (5th Cir. 1973). As University Computing recognizes, development costs can be factored into this reasonable royalty. See id.; Sonoco Prods. Co. v. Johnson, 23 P.3d 1287, 1289 (Colo. App. 2001); Kubik, Inc. v. Hall, 224 N.W.2d 80, 93-94 (Mich. App. 1975).

Sonoco Products teaches that "by utilizing all the evidence and the reasonable inferences emanating therefrom, [a court should] devise a fair method for assessing . . . damages," 23 P.3d at 1290. See also BE&K Constr. Co. v. Will & Grundy Counties Bldg. Trade Council, AFL-CIO, 156 F.3d 756, 770 (7th Cir. 1998) (holding, however, that damages "need not be proven with the certainty of calculus"). Flexibility in determining a reasonable royalty is imperative in cases involving business torts because "public policy requires that unfair competitors must not be allowed to profit by their wrongful methods and that those who have been injured by them should receive adequate compensation for the loss or injury they have suffered." Olson v. Nieman's, Ltd., 579 N.W.2d 299, 311 (Iowa 1998) (quoting Jet Spray Cooler, Inc. v. Crampton, 385 N.E.2d 1349, 1356 (Mass. 1979)). Here, CnG-V's only evidence of damages was the total cost to develop and maintain the two manuals. William Foltyn testified that a total of $134,725 was spent developing and maintaining the two manuals. He said that approximately 60 percent of this money was spent developing Exhibit 4, which Saunders pirated to create her 18-page document. In its post-trial brief, CnG-V articulates a basis for estimating a reasonable royalty for the portion of CnG-V's materials contained in those 18 pages.

10

While the court initially was of the impression that CnG-V's estimate was too speculative to support a reasonable royalty, review of the case law and consideration of the methodology employed in CnG-V's post-trial brief compels a different conclusion. In its post-trial memorandum, CnG-V suggests that a reasonable royalty be calculated based on an estimate of the percentage of the development costs incurred to create the 18 pages that it proved were misappropriated. As noted previously, such an estimate yields a reasonable royalty figure of $11,554.

Considering the admonition in the statute that "a complainant is entitled to recover damages for misappropriation," Va. Code § 59.1-338, and the notion from the cases that courts are to "remain flexible and imaginative," University Computing, 504 F.2d at 538, in fashioning a reasonable royalty, a damage award of $11,554 is reasonable in this case. Where damages are uncertain, such uncertainty should not preclude recovery: plaintiff should be given every opportunity to prove damages. Id. at 539.

The court in University Computing provided that a reasonable royalty could be calculated through consideration of a number of factors. Two factors support an award in this case. First, CnG-V introduced evidence as to the costs of developing the manuals. Second, the evidence established that the trade secret was actually used by CnG-V. While the court initially indicated that plaintiff had not sufficiently demonstrated what portion of the total development costs were associated with the 18-page document it proved it was a misappropriated trade secret, CnG-V's post-trial brief suggests a reasonable basis for such an estimate. As noted previously, the court does not believe that any maintenance costs should be included in this estimate as Exhibit 4, the source of the pirated material, on its face indicates that it was not revised since it was created.

11

Taking further reductions for pages containing public information yields a reasonable damage estimate of $11,554. To be sure, this is a rough estimate. But considering the admonition contained in the Virginia Trade Secrets Act and the case law which allows flexible and imaginative estimates of damage in trade secret cases, the court is now convinced that this $11,554 estimate of damages constitutes a reasonable royalty, and is neither too conjectural nor speculative.

Plaintiff has one more hurdle to surmount before damages may be awarded, however. Plaintiff must show that it, as opposed to another corporate entity, is entitled to such a reasonable royalty. While plaintiff proved that its parent holding company, CnG-Fin., incurred the costs to develop the manuals, there was no evidence that the plaintiff in this case, CnG-V, incurred any such expenses. No evidence was introduced apportioning any of the monies CnG-Fin. paid to Deloitte Touche to develop its Policy and Procedure manuals to CnG-V. While CnG-V appears to have the authority to use the trade secret developed by its holding company, its is another thing altogether to award damages to CnG-V as a reasonable royalty based on development costs it never incurred. There was no evidence that CnG-V paid any of these development costs, and no financial or other arrangements between the holding company which incurred the costs, CnG-Fin., and the plaintiff, CnG-V, were introduced in evidence.

Certainly, were the shoe on the other foot, CnG- Fin., the holding company, could not be called upon to pay the liabilities of its wholly owned subsidiary, CnG-V. It is difficult, therefore, to see how CnG-V may recover a reasonable royalty for theft of a trade secret based on development costs incurred by the holding company, CnG-Fin., a separate corporate entity. Plaintiff has cited no legal authority to support its position.

12

Permitting CnG-V use development costs paid by its corporate parent runs afoul of at least two general principles of American corporate law: the requirement that parties must have individual standing and the idea that corporate affiliates are to be treated as if they are legally distinct. It is a general principle of corporate law that the legal rights of parent and subsidiary corporations are separate. See United States v. Bestfoods, Inc., 524 U.S. 51, 61 (1998). Shareholders do not generally have standing to redress an injury to the corporation in which they hold stock. Shell Petroleum, N.V. v. Graves, 709 F.2d 593, 595 (9th Cir.), cert. denied, 464 U.S. 1012; Sherman v. British Leyland Motors, Ltd., 601 F.2d 429, 439-40 (9th Cir. 1979) (holding that a sole shareholder had no standing to assert either federal or state law claims). Here, plaintiff's claims are based on monies expended not by it, but by its parent corporation. Plaintiff's claims are thus violative of one of the organizing principles of American corporate law.

Further, it is clear that parties are not to premise their damage claims on those of third parties. "The plaintiff must assert his own legal rights and interests, and cannot rest his claim on the legal rights and interests of third parties." Warth v. Seldin, 422 U.S. 490, 499 (1975) A corollary to this is that plaintiff cannot stake its claim for a reasonable royalty on monies spent by another party to develop the trade secret.

Thus, while plaintiff has now suggested a sufficient basis upon which to calculate a reasonable royalty, it may not recover this amount in damages as it had no stake in the development costs which undergird the royalty calculation. As a result, there simply is no basis upon which to award any damages to plaintiff CnG-V.

### III. Conclusion

For the reasons stated in open court, judgment will be entered for defendants on plaintiff's tortious interference claim and, for the reasons stated herein, on plaintiff's claim for damages for trade secret misappropriation.

Entered this 9th day of August, 2005.

/s/ Michael F. Urbanski
Michael F. Urbanski
United States Magistrate Judge